# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRIAN BURNSIDE,

Plaintiff,

v.

MARQUETTE COUNTY, and BRENDAN CUTRELL,

Defendants.

Case No. 25-CV-195-JPS

**ORDER**

## 1. INTRODUCTION

On December 9, 2023, Defendant Brendan Cutrell ("Cutrell")—acting at the time as a deputy with the Marquette County Sheriff's Department—pulled over Plaintiff Brian Burnside ("Burnside") for speeding. ECF No. 25 at 2. However, the stop did not end with a simple citation. Cutrell detained Burnside, holding him until a K-9 could arrive to perform an open-air sniff test for illegal drugs. *Id.* at 10–11, 17. This test uncovered illegal drugs, which lead to state charges that were dismissed and eventually the present litigation. *Id.* at 20–21.

In February 2025, Burnside sued Cutrell and Marquette County[1] (collectively, "Defendants") under 42 U.S.C. § 1983 for unreasonable search and seizure in violation of the Fourth and Fourteenth[2] Amendments of the

---

[1]Although no municipal liability claim is asserted against Marquette County, it is included for indemnification purposes. *See* ECF No. 24 at 2 n.2.

[2]Though the complaint does not reference the Fourteenth Amendment, the Fourth Amendment is applicable to Cutrell as a state actor via the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) ("[T]he Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth . . . .").

United States Constitution. *See* ECF No. 1. In September 2025, the parties cross-moved for summary judgment, ECF Nos. 20 and 23, which are now fully briefed. ECF Nos. 21, 30, 33 (briefing on Burnside's motion); ECF Nos. 24, 31, 32 (briefing on Defendants' motion).

For the reasons described below, the Court will grant Burnside's motion for partial summary judgment on the issue of liability, ECF No. 20, and deny Defendants' motion, ECF No. 23.

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing FED. R. CIV. P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)).

> At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.

*Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). "Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

**3. RELEVANT FACTS**

Around 10:30 p.m. on December 9, 2023, Cutrell, then working as a deputy with the Marquette County Sheriff's Department, was driving north on I-39 and observed two vehicles traveling south at about eighty-five miles per hour. ECF No. 25 at 2, 5. Cutrell proceeded to turn around and follow the two vehicles. *Id.* at 2. One of the vehicles changed lanes without using a signal and was weaving within the lane. *Id.* at 3. Cutrell then observed the same car, driven by Burnside, accelerate up to eighty-nine miles per hour, and he then turned on his lights and siren to initiate a traffic stop. *Id.* at 3, 7.

The car took about twenty-three seconds to slow and activate its turn signal. *Id.* at 4. From the time the officer activated his lights, it took Burnside about fifty-two seconds to pull over. *Id.* at 5. The stop occurred around near the ninety-six mile marker of I-39. *Id.* at 8. When approaching the vehicle, Cutrell shined his light at the car's rear window and found that he could not observe the car's interior. *Id.* at 5. Cutrell believed that this indicated the windows were tinted in excess of the permissible tint under Wisconsin law.

*Id.* However, Cutrell did not have a tint meter with him and therefore could not measure the window tint at the time. *Id.* at 6.

Cutrell then approached the passenger side window, which was rolled down as Cutrell neared the car. *Id.* The officer smelled a strong odor of cologne from the vehicle, saw an air freshener hanging from the rearview mirror, and observed that both the driver and passenger seats were reclined behind the car's B-pillar. *Id.* at 6–7. Cutrell then informed the vehicle's occupants that he observed them travelling at eighty-nine miles per hour and asked the driver, Burnside, for proof of insurance, registration, and his driver's license. *Id.* at 7. The passenger, Pierre L. Camacho ("Camacho"), explained that the vehicle belonged to him. *Id.* at 8–9. The officer inquired about the travelers' route, to which Camacho responded that they were coming from Wausau. *Id.* at 8. Camacho and Burnside then both stated that they were headed to the Wisconsin Dells. ECF No. 28-1 at 2:51-54. Cutrell believed that exits at the 106 and 100 mile markers offered a more direct route to the Dells. ECF No. 25 at 8. However, I-39 southbound connects to another highway that offers an alternative route to the Wisconsin Dells. *Id.*

Cutrell then asked whether Burnside's seatbelt was behind his back, and Camacho responded that it was. *Id.* at 9. The officer proceeded to request identification from Camacho, which the passenger refused to provide before explaining that he was just joking with the officer. *Id.* Camacho identified himself and indicated that he was wearing an ankle monitor as required by Wisconsin law, though not on probation or parole. *Id.* at 9–10. Cutrell observed throughout their interaction that Camacho frequently touched his face. *Id.* at 10.

By the end of their conversation, Cutrell did not believe that he had reasonable suspicion that Burnside was driving while intoxicated or under

the influence of a controlled substance. *Id.* at 10. However, the officer did believe that the car contained illicit drugs or alcohol. *Id.* The conversation lasted about two minutes. *Id.* at 6, 10.

Cutrell, while walking back to his car requested a second unit, then, a few seconds later, asked for a K-9 unit. *Id.* at 11. Cutrell informed dispatch of Burnside and Camacho's information so that it could search the records for the travelers. *Id.* at 12. Cutrell concurrently searched the computer in his vehicle for their records and learned of their sex offender statuses and Camacho's prior conviction for possession of a firearm, which did not contribute to his suspicion of criminal activity. *Id.* at 12–13. Cutrell also verified that Burnside had a valid driver's license. *Id.* at 12. The officer then began searching Wisconsin's Consolidated Court Automation Programs ("CCAP") system, while waiting for dispatch to complete its check. *Id.* at 13. Dispatch then informed him that neither traveler had any restrictions or open cases and that they were not on probation. *Id.* Nevertheless, Cutrell persisted in conducting his own research on CCAP. *Id.*

While Cutrell was waiting, Deputy Nicholas Spanske ("Spanske") arrived. *Id.* at 14. Spanske had a tint meter in his car and tested the tint on Burnside's front and rear windows, which revealed the tint to be in violation of state law. *Id.* at 14–15. Spanske did not detect the smell of cologne when he approached the car but noted that it was windy. *Id.* Cutrell then finalized and printed the citations for speeding, the warning for lane deviation, and the citation for window tint. *Id.* at 16. The officer waited in his car for about a minute before conferring with Spanske for about thirty seconds. *Id.* at 17. Cutrell proceeded to inform the travelers that they were not free to go with the citations in hand. *Id.* Camacho objected to the detention on the grounds that he was being racially profiled. *Id.* at 18.

The K-9 unit arrived and began the open-air sniff test of the car while Cutrell conversed with Burnside and Camacho. *Id.* at 18–19. Specifically, the K-9 began its sniff of the vehicle at 10:57:16 p.m. *Id.* at 18. And at abut 10:57:24 p.m., Cutrell had finished delivering and explaining the citations. *Id.* The K-9 gave a positive alert to the presence of drugs in the car at about 10:57:41 p.m., and the officers discovered a pistol, ammunition, an open whiskey bottle, and a clear bag containing a leafy green substance, which later tested positive for THC, on searching the car. *Id.* at 20. These items prompted state court charges against Burnside, which were dropped after Burnside filed a successful motion to suppress. *Id.* at 20–21.

## 4. ANALYSIS

To prevail on his § 1983 claim, Burnside must show a deprivation of a federal right by someone acting under color of state law. 42 U.S.C. § 1983. As the parties largely agree on the facts, this Court is left to resolve their legal consequences. The parties do not dispute whether Cutrell was acting under color of state law, nor do they dispute that the initial stop was valid. Rather, the parties focus on (1) whether Cutrell prolonged the stop in violation of the Fourth Amendment and, if he did, (2) whether Cutrell is entitled to qualified immunity. Burnside argues that "Cutrell illegally extended [the] traffic stop to wait for a K-9" and thereby violated his Fourth Amendment rights. ECF No. 21 at 1, 6. Defendants argue that Cutrell did not unreasonably delay the stop, that he had a reasonable suspicion for the duration of the traffic stop, or that he is entitled to qualified immunity. ECF No. 24 at 1–2. The Court holds that Cutrell unreasonably delayed the stop, lacked a reasonable suspicion to extend it, and is not entitled to qualified immunity.

### 4.1 Did Cutrell Have Reasonable Suspicion?

"Determinations of . . . reasonable suspicion are normally mixed questions of fact and law, but when 'what happened?' is not at issue, the ultimate resolution of whether . . . reasonable suspicion existed is a question of law . . . ." *United States v. Dixon*, 137 F.4th 592, 601 (7th Cir. 2025) (quoting *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010)) (further citations omitted). Because the parties largely agree on "what happened," whether Cutrell had reasonable suspicion for the stop here is appropriate to resolve at summary judgment.

"Traffic stops are seizures, so they must be reasonable under the circumstances." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 809 (1996)). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' —to address the traffic violation that warranted the stop, . . . and attend to related safety concerns . . . ." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Sharpe*, 470 U.S. 675, 685 (1985); and *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

"Reasonable suspicion exists when, considering the totality of the circumstances, an officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Cole*, 21 F.4th at 433 (quoting *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (further citation omitted)). The level of suspicion necessary is more than a mere hunch but less than probable cause or proof by a preponderance of the evidence. *Navarette*, 572 U.S. at 397 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable

suspicion depends "upon both the content of information possessed by police and its degree of reliability." *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

The Court "must consider the factors supporting an officer's suspicion cumulatively," but it "need not accept all of an officer's proffered justifications at face value." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 669 (7th Cir. 2018). When considering the totality of the circumstances, examining each factor in isolation is not permitted, but the Court may discuss each factor separately. *Id.* at 668 (quoting *Cortez*, 449 U.S. at 417 and *District of Columbia v. Wesby*, 583 U.S. 48, 60–61 (2018)). The Court will therefore discuss each factor potentially contributing to a reasonable suspicion in this case while keeping the totality of the circumstances in view.

#### 4.1.1 Was the Stop Extended?

The parties argue extensively over whether Cutrell extended the stop beyond its original mission at all. ECF No. 21 at 7–10; ECF No. 24 at 6–14; ECF No. 30 at 4–13; ECF No. 31 at 3–8; ECF No. 32 at 2–5; ECF No. 33 at 3–5. Defendants argue that Cutrell's activities reasonably related to the mission of the traffic stop or officer safety and that the sniff test was initiated before the mission of the stop came to an end. ECF No. 24 at 6–14. Burnside argues that Cutrell engaged in investigative larks, untethered from the stop's mission, and that he delayed the stop when the officer approached

the car with the tickets and told the travelers that they were not free to go. ECF No. 31 at 3–8. The Court has little trouble concluding that Cutrell extended the stop.

The Fourth Amendment does not allow for a de minimis extension of a traffic stop. *Rodriguez*, 575 U.S. at 356–58. "The critical question . . . is . . . whether conducting the sniff 'prolongs' . . . 'the stop.'" *Id.* at 357. Here, Cutrell undoubtedly extended the stop when he told Burnside and Camacho that they were not free to go. Cutrell had completed the stop's traffic related mission after he handed the tickets to the travelers and finished explaining the citations. Regardless of whether Cutrell was reasonably diligent in pursuing the mission of the stop prior to its completion, he prolonged the stop to complete the sniff test.

Defendants' argument that the sniff did not unreasonably prolong the stop is unavailing. As stated in their briefing and in the joint statement of facts, the sniff was initiated at 10:57:16 p.m., Cutrell finished handing over and explaining the citations at 10:57:24 p.m., and the K-9 positively alerted to narcotics at 10:57:41 p.m. The sniff therefore prolonged the stop for at least the time between Cutrell finished his duties with respect to the citations and when the K-9 positively alerted to the narcotics. Although a short period of only about seventeen seconds, the Supreme Court has explicitly rejected the view that the Fourth Amendment allows for de minimis extension of traffic stops to complete open-air sniff tests. *Rodriguez*, 575 U.S. at 356–58.

Because the Court resolves the issue of whether the stop was extended on this basis, it does not reach the other issues raised in the parties' briefing.[3]

#### 4.1.2 Was Cutrell's Suspicion Reasonable?

Defendants argue that Cutrell's suspicion of drug trafficking was reasonable under the totality of the circumstances based on: (1) Burnside's driving behavior, ECF No. 24 at 14–16; (2) the window tint, *id.* at 17; (3) the smell of cologne, *id.* at 17–18; (4) Cutrell's belief that Burnside and Camacho were nervous, *id.* at 18–19; (5) the place of departure, *id.* at 19–20; and (6) the travel route, *id.* at 20. *See also* ECF No. 30 at 13–22; ECF No. 32 at 5–12.

Burnside argues that Cutrell lacked reasonable suspicion because: (1) Burnside's driving behavior was not suspicious, ECF No. 31 at 10–12; (2) window tint is common and therefore not suspicious, *id.* at 12–13; (3) the smell of cologne was weak and not suggestive of unlawful activity, *id.* at 13–14; (4) that the travelers were not nervous, *id.* at 14–15; (5) the place of departure did not reasonably contribute to any suspicion, *id.* at 15–16; and (6) the travel route is not suspicious as it was an alternative route to the Dells, *id.* at 16–18. *See also* ECF No. 21 at 10–18; ECF No. 33 at 5–10.

Defendants argue that Burnside's driving behavior was suspicious because speeding is consistent with driving under the influence, which is in turn consistent with possession of illegal narcotics; Burnside delayed pulling over, which is consistent with evading the law; he improperly changed lanes, and he weaved within the lane, which is again consistent

---

[3]The Court recognizes that how long Cutrell prolonged Burnside may become relevant as to extent of damages Burnside's damages. The parties may re-raise their arguments on this issue in their pretrial briefing.

with driving under the influence. Plaintiff responds that speeding is so common as to be indicative of almost nothing and Burnside's delay was not significant.

The Court accords minimal weight to Burnside's driving behavior. "[M]any people speed," and "many drivers who speed are not involved in drug activity. One might infer that those with illegal drugs in their cars would be even less inclined to drive significantly over the speed limit to avoid getting stopped." *Lewis v. Columbia County*, No. 23-CV-77-JDP, 2024 WL 1833817, at *4 (W.D. Wis. Apr. 26, 2024), *appeal dismissed sub nom. Lewis v. Elson*, No. 24-1807, 2024 WL 4751295 (7th Cir. July 19, 2024). Additionally, the Court cannot say that taking under a minute to pull over is suspicious and indicative of particular criminal behavior like drug trafficking. *United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006) ("[T]hirty seconds to a minute was a reasonable amount of time for Jenson to respond to the flashing of the emergency lights."). And Defendants may not ignore that the full facts mitigate a suspicion that Burnside was driving under the influence. As they agreed in the joint statement of facts, "[b]y the end of this conversation, . . . Cutrell did not believe that he had reasonable suspicion that Burnside was specifically driving while intoxicated or under the influence of a controlled substance." ECF No. 25 at 10.

The Court accords some weight to the suspicion caused by the tinted windows. Tinted windows may fairly contribute to a reasonable suspicion as they may conceal the interior of a car from public observation, hiding contraband such as illicit drugs. *See United States v. Palmer*, 820 F.3d 640, 647 (4th Cir. 2016) (affirming reasonable suspicion based on high crime area, tinted windows, nervous traveler, overwhelming smell of multiple air fresheners, traveler was a suspected member of a violent gang, driver's

license listed a P.O. box address, traveler was driving a vehicle registered to someone else, traveler had a criminal record that included four previous arrests for narcotics); *but see United States v. Guerro-Barajas*, 240 F.3d 428, 433 (5th Cir. 2001) (holding that heavily tinted windows by themselves do not give rise to reasonable suspicion of transporting illegal aliens). However, while the Court affords this factor more than minimal weight, the Court is cautious in doing so, as this factor may apply to a broad category of otherwise lawful travelers. *See Reid*, 448 U.S. at 441; *see also Rodriguez-Escalera*, 884 F.3d at 671; *Guerro-Barajas*, 240 F.3d at 435 ("Today, tinted automobile windows are so common that they can hardly be considered an indicium of criminal activity." (collecting cases)) (Dennis, J., dissenting).

The smell of cologne provides only minimal support for reasonable suspicion. *Columbia County*, 2024 WL 1833817, at *4 ("[W]earing cologne or perfume is common lawful activity that does not suggest unlawful activity.").[4] Additionally, the Court cannot ignore the mitigation provided by the full factual circumstances here: the smell had dissipated by the time Spanske measured the window tint. And, while Defendants are correct that the Seventh Circuit recognized in *Rodriguez-Escalera* that the excess presence of air fresheners may contribute to reasonable suspicion, the court there held that the facts when viewed in their totality were insufficient to establish reasonable suspicion. *Rodriguez-Escalera*, 884 F.3d at 666, 670 (officer smelled "very pungent" scent of air fresheners, but "[a] non-

[4]If Defendants had presented evidence that the travelers put on the cologne *in response to* Cutrell pulling them over, the Court might find differently, even if the smell had dissipated by the time Spanske measured the window tint. *See United States v. Ahmed*, 825 F. App'x 589, 592 (10th Cir. 2020) (finding the fact that "the backseat passenger doused herself with cologne as the driver rolled down his window" supported reasonable suspicion).

excessive presence of air fresheners . . . may show nothing more than a car owner's preference for the smell . . . or desire to cover up other, lawful odors" (citation omitted)).

Having reviewed the video recording of the incident, the Court struggles to consider either Camacho or Burnside as exhibiting any nervousness. Their initial conversation with Cutrell was friendly, polite, and brief. However, in the interest of viewing the facts and possible inferences in the light most favorable to Defendants, the Court will accord this factor minimal weight. Nervousness can support reasonable suspicion. *Cole*, 21 F.4th at 434 (finding that "extreme nervousness reinforced a reasonable suspicion"). But, "[m]ost people, when confronted by a police officer, are likely to act nervous . . . thus making such behaviors of very little import to a reasonable suspicion determination." *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013) (collecting cases). To the extent the travelers were nervous, such behavior was consistent with the anxiety appropriate when confronted by a police officer and not the extreme nervousness apparent in *Cole*, 21 F.4th at 434.

Defendants argue that Burnside's place of departure, Wausau, Wisconsin, contributed to Cutrell's suspicion because Wausau was a known "narcotics hub." ECF No. 24 at 19–20. As Plaintiff responds, criteria so broad as to encompass an entire city of presumably law-abiding residents offers little support for any suspicion, reasonable or otherwise. ECF No. 31 at 15–16; *Rodriguez-Escalera*, 884 F.3d at 670 ("We do not think the court erred in discounting the probative value of the fact that the couple began their trip in greater Los Angeles, Moran's home . . . ." (citing *Reid v. Georgia*, 448 U.S. 438, 441 (1980))). Defendants' case suggesting that location can contribute to reasonable suspicion is inapposite: a "little-traveled" road near the

southern border "used by smugglers to avoid [a border patrol] checkpoint" is hardly comparable to a city in Wisconsin. *See Arvizu*, 534 U.S. at 277.

Similarly, Burnside's route of travel offers practically no support for any suspicion. Although Cutrell believed alternative exits offered more direct routes to the Dells, this suspicion is mitigated by the fact that Burnside was on a valid route to the Dells, as Defendants conceded in the joint statement of facts. Burnside and Camacho's explanation of the travel route was objectively reasonable. They stated they were going from Wausau to the Dells and were in fact on just such a route. Nothing in the record suggests that they were using a less frequented route to avoid detection as was the case in *Arvizu*. *See id.*

The cases Defendants cite to demonstrate what actual inconsistency or implausibility looks like. In *United States v. Lewis*, the traveler inconsistently claimed that he was picking up his son from school and that his son worked at a warehouse. 920 F.3d 483, 492 (7th Cir. 2019). In *Cole*, the traveler offered an increasingly implausible story:

> He explained that he was a chef who split his time between Los Angeles, Maryland, and New York, adding that he kept his Arizona license because of the expiration date and that he might be moving to Florida soon. . . . Cole . . . said he had stopped in Cincinnati on his way from Maryland to Colorado. . . . After Cole volunteered that he worked as a chef . . . Trooper Chapman asked where he worked. Cole replied with his occupation, saying he was a personal chef. Trooper Chapman tried asking the same question another way: "Who do you work for?" This time, Cole responded that he worked for two former professional football players and that "in between" he was a chef.

21 F.4th at 432 (citations omitted). When someone tells an obvious lie or an ever-changing story of increasing implausibility, an officer's suspicion of criminal activity may be raised. However, this was clearly not the case here.

In view of the Burnside's driving, the car's tinted windows, the smell of cologne, the travelers' behavior, their place of departure, and their travel route, Cutrell could not have possessed a *reasonable* suspicion of drug trafficking. The factors listed here lack a reasonable nexus to the particular criminal activity of drug trafficking. Cutrell had at most a hunch, and, while he was not obligated to rule out innocent explanations, *Arvizu*, 534 U.S. at 277, he needed to ask follow-up questions or otherwise investigate if he wanted to develop his hunch into a reasonable suspicion.

The case law demands this result. *Compare, e.g.*, *Cole*, 21 F.4th at 434–35 (affirming that implausible and changing story of where the individual was from, where he was going, and how long he stayed there—along with mixed states for vehicle registration, license plates, and driver's license—formed a reasonable suspicion); *Lewis*, 920 F.3d at 493 (affirming that nervousness exhibited *after* driver was told he would only receive warning ticket; being on supervised release for a drug offense; and inconsistent travel explanations formed a reasonable suspicion); *and Palmer*, 820 F.3d at 647 (affirming reasonable suspicion based on high crime area, tinted windows, nervous traveler, overwhelming smell of multiple air fresheners, traveler was a suspected member of a violent gang, driver's license listed a P.O. box address, traveler was driving a vehicle registered to someone else, traveler had a criminal record that included four previous arrests for narcotics), *with, e.g.*, *Rodriguez-Escalera*, 884 F.3d at 671 (affirming that traveling from a drug source city; the presence of air fresheners in a car; and inconsistent but explained travel plans were insufficient as a matter of law

to establish reasonable suspicion); *Reid*, 448 U.S. at 441 (holding that travelers who arrived at a city known as a drug distribution center in the early morning, when law enforcement activity was diminished; appeared to be trying to conceal the fact that they were traveling together; and apparently had no luggage other than their shoulder bags were insufficient as a matter of law to establish reasonable suspicion); *United States v. Pennington*, 190 F.4th 538, 545–47, 549–50 (7th Cir. 2026) (noting that officer who detained traveler for the first stop at issue based on nervousness, prior convictions for drug crimes, and possible gang affiliation "unreasonably prolonged" the stop); *United States v. Diaz*, No. 2:16-CR-00055-DCN, 2018 WL 1697386, at *7–12 (D.S.C. Apr. 6, 2018) (holding that the presence of air fresheners, starting location of city known as a source of drugs, use of a rental car, travel along a "drug corridor," nervous demeanor, expiring car rental agreement, and conflicting travel plan explanations were insufficient to form reasonable suspicion); *United States v. Garcia*, 644 F. Supp. 3d 474, 489–90 (N.D. Ind. 2022) (holding that nervousness and arguably inconsistent statements about travel plans were "perhaps enough to support a developing hunch" but insufficient for reasonable suspicion); *United States v. Robinson*, No. 4:19-CR-00143-DCN, 2020 WL 912744, at *3 (D. Idaho Feb. 25, 2020) (holding that the initial smell of marijuana, nervousness, and unspecific travel plans were insufficient to establish reasonable suspicion); *and Columbia County*, 2024 WL 1833817, at *3–4 (holding where there was an area with a lot of drug activity; driver was speeding and did not immediately pull of the road; strong odor of cologne or perfume; the travelers seemed nervous; the driver number taped to the back of driver's cell phone; and the driver's previous conviction for a drug offense was insufficient to establish reasonable suspicion).

A "mere possibility" of unlawful activity is not "enough to create a reasonable suspicion of a criminal act." *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016). Based on the record before the Court, Cutrell's seizure violated Burnside's Fourth Amendment rights as a matter of law, and Burnside has met both elements of his § 1983 claim.

The Court is troubled by Defendants' inclination to list out innocuous facts and categorize them as suspicious. As Judge Posner remarked, "[w]hether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (collecting cases). Collecting a list of innocent facts does not establish reasonable suspicion. Reasonable suspicion is objective and requires articulable, *particularized* facts. The car's tinted windows is the only fact that Defendants have pointed to that bears some particularized relationship to drug trafficking. The other facts at issue here either too broadly capture innocent conduct to provide more than minimal suspicion or are subject to reasonable explanation under the circumstances.

### 4.2 Is Cutrell Entitled to Qualified Immunity?

Qualified immunity is an affirmative defense which bars liability for "government officials performing discretionary functions . . . if their conduct could reasonably have been thought consistent with the rights" they violated. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006)) (internal quotations omitted) (further citation omitted). Defeating qualified

immunity requires showing (1) a violation of a constitutional right, and (2) that the right was clearly established at the time of the violation. *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). Once a defendant properly raises qualified immunity as an affirmative defense, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). As discussed above, Burnside has satisfied the first element.

Defendants argue that Burnside's rights were not clearly established enough at the time of the alleged violation. ECF No. 23 at 11–15; ECF No. 32 at 13–16. Burnside responds that *Rodriguez* and *Rodriguez-Escalera* establish the right with sufficient clarity to defeat qualified immunity. ECF 31 at 19–21. A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations and internal quotations omitted) (further citation omitted)). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (further citation omitted). A right may be clearly established in three ways: first, by a closely analogous case finding the alleged violation unlawful, *Stockton v. Milwaukee County*, 44 F.4th 605, 620 (7th Cir. 2022) (citing *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018); second, by identifying relevant case law that establishes a clear trend such that the recognition of the right was merely a matter of time, *id.* (citing *Reed*, 906 F.3d at 547); or third, by conduct so egregious and unreasonable that no official could have thought that they were acting

lawfully, *id.* (citing *Reed*, 906 F.3d at 547 and *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Supreme Court has emphasized that courts must not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because Defendants move for summary judgement on the issue of qualified immunity, the Court views the facts in the light most favorable to Burnside. The parties dispute whether Burnside's behavior exhibited nervousness during the stop. As previously discussed, the Court agrees with Burnside that he was not nervous. This is consistent with the Court's own review of the footage. ECF No. 27-2; *see Scott*, 550 U.S. at 380; *see also Rodriguez-Escalera*, 884 F.3d at 669 (in the context of a motion to suppress, "the court was not required to credit Patterson's testimony that the couple appeared nervous when the court's own review of the traffic stop footage led it to the opposite conclusion"). Further, under *Scott*, Defendants' disagreement with what the video evidence clearly shows is not sufficient to create a dispute of material fact. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The case of *Rodrigeuz-Escalera* is instructive here. In *Rodriguez-Escalera*, the officer thought of Los Angeles, the starting location and home to one of the travelers, as a drug source city. *Rodriguez-Escalera*, 884 F.3d at 669. One traveler stated that they were headed to New York for two weeks

and the other claimed they were headed to Pennsylvania for one or two days because the trip to New York was a surprise. *Id.* at 664. And, the officer's suspicions were heightened because of the presence of air fresheners in the car. *Id.* at 669. The facts at issue here closely resemble the facts of *Rodriguez-Escalera*. Cutrell thought that Burnside's starting location was suspicious, that the travel plans were implausible or inconsistent, and the smell of cologne heightened his suspicions. However, this case departs from *Rodriguez-Escalera* in that the driving behavior and tinted windows provide additional support for Cutrell's suspicion. Nonetheless, the Court holds that the case law clearly established that Cutrell lacked reasonable suspicion under these circumstances.

In *Lewis v. Columbia County*, Western District of Wisconsin held that the officer lacked reasonable suspicion for the stop and denied qualified immunity. 2024 WL 1833817, at *3–6. The evidence presented included: (1) the area had a lot of drug activity; (2) the driver was speeding and did not immediately pull of the road; (3) there was a strong odor of cologne or perfume when the officer approached the car; (4) the travelers seemed nervous; (5) the driver had a number taped to the back of his cell phone, which the officer considered to be a sign of a burner phone used by drug traffickers; and (6) the driver had previously been convicted of a drug offense. *Id.* at *3. The Western District concluded that all but the fifth and sixth factors provided only minimal support for reasonable suspicion. *Id.* at *3–5. "[M]ost of the factors were benign, and those that might have"

contributed to reasonable suspicion "were undermined by the fuller factual context."[5] *Id.* at *6.

As explained above, most of the factors that Defendants have put forward were innocuous or "benign." As to the two factors distinguishing this case from *Rodriguez-Escalera*, Burnside pulled over within a reasonable time frame, and any suspicion that Cutrell might have had that he was trafficking drugs because the officer suspected him of driving under the influence due to his inattentive driving was mitigated by the end of the conversation. The chain of logic that because Burnside was driving inattentively, the likelihood that he was driving under the influence increased, which in turn increased the likelihood of drug trafficking, was broken because by the end of the conversation Burnside did not appear to be driving under the influence. And, as the criminal history factor in *Columbia County* was insufficient to move the case beyond the purview of precedent, so too is the tinted windows factor here, given the lack of particularity of the criteria as well as Fifth Circuit case law to the contrary.[6] *See supra.* § 4.1.2 (citing *Jenson*, 462 F.3d at 405).

Defendants' cases in support of qualified immunity are unpersuasive. Defendants cite to *Lewis*, *Cole*, and *Martin* to argue that those cases are factually similar enough to create arguable reasonable suspicion sufficient for qualified immunity. ECF No. 24 at 24. The Court has explained

---

[5]The Court recognizes that *Columbia County* post-dates the stop at issue and does not rely on it as establishing the right but rather follows the reasoning articulated in the opinion.

[6]The Court recognizes that whether out of circuit case law can show clearly established law is an open question in the Seventh Circuit. *Schulte v. Leners*, 185 F.4th 744, 750 (7th Cir. 2026) (leaving the question of "whether out-of-circuit case law can show clearly established law" for a "future case").

why *Lewis* and *Cole* are unavailing above and so concerns itself only with *Martin v. Forest County* here. Defendants argue that in *Martin*, the court held that an anonymous tip that the plaintiff was transporting narcotics, tinted windows, and inattentive driving provided sufficient facts for reasonable suspicion of drug trafficking. ECF No. 24 at 24 (citing *Martin v. Forest County*, 677 F. Supp. 3d 853, 856–66 (E.D. Wis. 2023)). However, the most important factor there—the tip that identified the plaintiff by name—is nowhere in this record.

A case precisely on point is not required to defeat qualified immunity. *al-Kidd*, 563 U.S. at 741. The case law clearly requires that prolonging a stop demands objectively reasonable and particular suspicion and consideration of factors that mitigate suspicion. *See, e.g.*, *Rodriguez-Escalera*, 884 F.3d at 669–72; *Terry*, 392 U.S. at 28. Because the factors that Defendants relied upon are either broadly applicable or subject to mitigation based on the full factual context, this Court holds that no officer familiar with *Rodriguez* and *Rodriguez-Escalera* could have had reasonable suspicion of drug trafficking when detaining Plaintiff.[7] The Court will

---

[7]This Court considers the presence of two differentiating facts from *Rodriguez-Escalera* to present a difficult decision on qualified immunity, given the particularity with which the Seventh Circuit sometimes requires in qualified immunity cases. *See Smith v. Price*, 188 F.4th 988, 1000–09 (7th Cir. 2026) (right of prison inmate to be free from pain during transport was clearly established when inmate was not wearing a seatbelt, but was not clearly established when wearing a seatbelt). But the Seventh Circuit is not always so stringent. *See Stockton v. Milwaukee County*, 44 F.4th 605, 620–21 (7th Cir. 2022) (despite the absence of an analogous case, holding prison officer was not entitled to qualified immunity when he ceased his support of a prisoner who was incapable of sitting up and allowed the inmate to fall, thereby incurring injuries). How broadly or narrowly a right is defined is often dispositive for qualified immunity analysis, and in this ruling the Court seeks the ever elusive Goldilocks Zone of "just right."

therefore deny Defendants' motion for summary judgment on the basis of qualified immunity.[8]

## 5. CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment on the issue of liability will be granted, and Defendants' motion for summary judgment will be denied, leaving only the issue of damages for trial.

Accordingly,

**IT IS ORDERED** that Plaintiff Brian Burnside's motion for partial summary judgment, ECF No. 20, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Defendants Marquette County and Brendan Cutrell's motion for summary judgement, ECF No. 23, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of October, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

---

[8]Because the Court holds that this case falls within the trend established by *Rodriguez-Escalera*, the Court does not reach the issue of whether *Rodriguez* created a bright-line rule as Plaintiff argues. *See* ECF No. 31 at 20; *see also Klaver v. Hamilton County*, No. 22-5083, 2022 WL 16647970, at *4 (6th Cir. Nov. 3, 2022) ("[T]he Supreme Court has adopted a 'bright-line rule' that officers may not detain a driver for longer than necessary to complete a traffic stop simply because they want to investigate other crimes." (citations omitted)).